# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-875V

|  |  |
|---|---|
| PAMELA BROWNING,<br><br>               Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br><br>Filed: January 12, 2026 |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.*

*Julianna Rose Kober, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT REGARDING SITUS AND ONSET[1]

On June 12, 2023, Pamela Browning filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a right shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on January 11, 2022. Pet. at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, I find it more likely than not that the subject vaccination was administered in Petitioner's right deltoid, and that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination, as alleged.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Relevant Procedural History

Respondent filed his Rule 4(c) Report in February 2024, arguing that Petitioner's medical records do not document that she received the subject flu vaccine in her right shoulder (which is the alleged situs of injury).[3] Respondent's Report at 9, ECF No. 24 (internal citations omitted). Respondent also argued the contemporaneous medical records do not support the conclusion that the onset of Petitioner's pain occurred within 48 hours of vaccination. *Id.* at 10 (internal citations omitted).

I accordingly issued an Order to Show Cause highlighting the critical deficiencies in the record related to Petitioner's ability to establish onset,[4] and ordering Petitioner to show cause why her Table claim should not be dismissed. ECF No. 25. In response, Petitioner did not submit additional evidence in support of her claim, but rather filed a written briefing addressing the evidence supporting situs and onset and requesting I make factual findings on those issues. ECF No. 28. In January 2025, Respondent filed a status report maintaining his prior arguments that Petitioner cannot establish a Table SIRVA claim or the threshold issue of vaccine situs. ECF No. 30. The factual issues of onset and site of vaccine administration are thus now ripe for consideration.

## II.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which

---

[3] Respondent also relatedly notes that Petitioner's records show she received a *non-covered* version of the pneumococcal polysaccharide vaccine in her *left arm* on the same day as her receipt of the subject flu vaccine. Respondent's Report at 9 (citing Ex. 2 at 126).

[4] Within my Order to Show Cause, I discussed Respondent's objections regarding situs and noted that they had less facial support than those regarding onset. *See* ECF No. 25 at 3-4. As a result, the primary basis of my Order to Show Cause was Petitioner's failure to establish Table-consistent *onset.*

are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014). The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8; *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## III.   Relevant Factual Evidence[5]

Petitioner received the subject flu vaccine on January 11, 2022, while at a visit with a primary care physician ("PCP") to establish care. Ex. 2 at 112, 126. The vaccination

---

[5] Although I have reviewed all the submitted evidence in this case, including medical records, declarations, and arguments from the parties, only those facts relevant to site of vaccination and onset will be discussed herein, though other facts may be provided as necessary.

record shows that Petitioner received a non-covered version of the pneumococcal polysaccharide vaccine in her left deltoid on the same day as her January 11, 2022 vaccination – and her covered flu vaccine was administered in the left *thigh* (vastus lateralis). *Id.* at 126. The vaccine administration form includes computerized entries regarding situs for both vaccinations. The entries appear as follows:

**Influenza (IM) Preservative Free** *[last edited by Carol Whitaker on 1/11/2022 11:23]*

| | | |
|---|---|---|
| Administered by: Carol Whitaker | Administered on: 1/11/2022 | Dose: 0.5 mL |
| Site: Left vastus lateralis | Route: Intramuscular | NDC: 19515-818-41 |
| CVX code: 140 | Scanned barcode: 0110319515818411 | VIS date: 8/6/2021 |
| Product: influenza | Manufacturer: ID Biomedical Corporation | Lot number: 3PN2B |
| Expiration date: 6/30/2022 | | |

**Pneumococcal Polysaccharide** *[last edited by Carol Whitaker on 1/11/2022 11:22]*

| | | |
|---|---|---|
| Administered by: Carol Whitaker | Administered on: 1/11/2022 | Dose: 0.5 mL |
| Site: Left deltoid | Route: Intramuscular | NDC: 0006-4837-01 |
| CVX code: 33 | Scanned barcode: 0100300064837018 | VIS date: 10/30/2019 |
| Product: Pneumovax 23 | Manufacturer: Merck & Co. Inc | Lot number: UO18632 |
| Expiration date: 1/11/2023 | | |

In her original signed declaration (authored in June 2023), Petitioner attests that when she received her flu shot, she "felt stinging, swelling, and a burning tenderness" in her right shoulder. Ex. 1 ¶ 4. She also recalls "redness around the injection site and constant soreness[,]" especially when moving her arm. *Id.* Petitioner attests that in the 48 hours that followed, she experienced increased pain, soreness, tenderness, redness, and swelling in her right shoulder; she also had trouble lifting or moving her right arm. *Id.* ¶ 5. She states that in the "days and weeks that followed receiving the flu shot," she attempted unsuccessfully to treat her pain with home remedies such as a sling, a cane (as opposed to her normal walker), heating pad (and patches), ice, Icy Hot, ointment, and over-the-counter pain medications. *Id.* ¶ 7. Petitioner explains that she did not seek treatment initially because she "believed that the pain . . . would eventually go away." *Id.*

Approximately two months post-vaccination (on March 10, 2022), Petitioner had a scheduled follow-up visit with her neurologist regarding her history of seizures. Ex. 5 at 90. She described complaints including "generalized body pain as well as sometimes back pain," plus headaches. *Id.* Petitioner did not mention right shoulder pain during this visit. *See id.* at 90-93. She was referred to a pain management specialist for her complaints of generalized body pain. *Id.* at 93.

Later that month, on March 21, 2022, Petitioner saw a pain management specialist for lower back pain (present since 2000). Ex. 5 at 35-37. Within the musculoskeletal "review of systems" taken during this visit, Petitioner "deni[ed] shoulder pain." *Id.* at 36. The assessment included unspecified low back pain. *Id.*

4

Petitioner followed up with her pain management specialist regarding her low back pain on April 5, 2022. Ex. 5 at 32. She likewise did not complain of right shoulder issues during that visit. *See id.* On April 6, 2022, at the direction of her pain management specialist, Petitioner underwent an MRI of the lumbar spine. *Id.* at 55. The findings were specific to the lumbar spine (spinal stenosis and facet hypertrophic changes), without references to the right shoulder. *Id.* at 56.

On April 25, 2022 (now over three months post vaccination), Petitioner returned to her PCP complaining of "ongoing right arm pain since last office visit" (on January 11, 2022), and that she "th[ought] it was from a vaccine injection." Ex. 2 at 55. She reported that her pain had "been constant since the incident." *Id.* at 56. Specifically, it was noted "[s]ince 01/2022, [she] has been endorsing severe pain to right upper extremity after getting pneumonia and flu vaccine [sic]." *Id.* at 54. Petitioner stated that her swelling had since resolved but she still experienced severe, sharp pain that worsened with movement. *Id.* The PCP noted that an examination of the right shoulder was "difficult to perform due to pain" but revealed right upper extremity tenderness and pressure, and pain with range of motion ("ROM"). *Id.* at 54, 56. Petitioner was assessed with pain of the right upper extremity. *Id.* at 54.

Ten days later (on May 5, 2022), Petitioner had another visit with her pain management specialist for low back pain. Ex. 5 at 29. She declined a steroid injection for her lumbar pain "due to complication from flu vaccine." *Id.* at 30. The next day, at the direction of her PCP, Petitioner underwent an x-ray of the right shoulder. Ex. 2 at 31. The findings were specific for a possible calcific tendinitis. *Id.* at 32.

On May 10, 2022, Petitioner went to the emergency room ("ER") for "right upper arm" pain, swelling, discomfort, and fatigue "for 6 weeks" – or since roughly late March 2022. Ex. 4 at 2. She reported that she "had a flu shot approx [sic] 2-3 weeks prior to this occurring in the same area." *Id.* She also noted extreme pain with ROM. *Id.* Another history taken during this visit notes that she had "2 to 3 weeks [sic] worth of right shoulder/arm pain[,]" (thus dating back to April 2022) but that she "had a flu shot prior to the onset of the symptoms." *Id.* at 20. An examination revealed mild-to-moderate swelling of the right upper arm compared to left, thickening of the skin in that area, and tenderness. *Id.* at 4. Petitioner's treating physicians suspected she suffered from a pulmonary embolism, and a repeat right shoulder x-ray showed "minimal productive changes of the acromioclavicular and glenohumeral joints." *Id.* at 28. Petitioner was assessed with "[right] shoulder pain, mild [osteoarthritis ("OA")], subacute-chronic since influenza pneumonia vaccination." *Id.* at 20. Petitioner was advised to begin physical therapy ("PT").[6]

---

[6] It does not appear that Petitioner sought PT treatment at that time. For instance, on May 26, 2022, she cancelled her initial PT evaluation. Ex. 15 at 6. She subsequently rescheduled this appointment (for June

Later that month, on May 25, 2022, Petitioner returned to her PCP for her "ongoing right shoulder pain." Ex. 2 at 19. The PCP wrote that Petitioner had "been dealing with significant right upper extremity pain since 01/2020 to [sic] after getting pneumonia and flu vaccine [sic]." *Id.* at 17. An examination of the right shoulder revealed mild tenderness to palpation; Petitioner was assessed with pain of the right upper extremity. *Id.*

Petitioner followed up with her pain management specialist for low back pain on June 6, 2022. Ex. 5 at 26. The visit notes contain Petitioner's history of "right upper extremity pain since getting a flu vaccine by PCP." *Id.* at 27. She otherwise received treatment for her low back pain. *See id.*

On June 23, 2022, Petitioner sought care with an orthopedist for right shoulder pain. Ex. 3 at 19. Specifically, she complained of "right upper arm pain. Mostly in her shoulder. She relate[d] it to after getting a flu shot." *Id.* Petitioner exhibited pain with motion of the right shoulder upon examination. *Id.* at 21. The orthopedist interpreted Petitioner's prior x-rays and opined they showed "no significant degenerative changes or acute findings." *Id.* The treater included a note in the assessment, stating that Petitioner had "chronic right shoulder pain which [she] relat[ed] to a flu shot." *Id.* Petitioner was assessed with adhesive capsulitis; she thus received a steroid injection in the right shoulder.[7] *Id.*

A month later (July 28, 2022), Petitioner followed up with her orthopedist. Ex. 3 at 5. An examination showed reduced ROM in the right shoulder. *Id.* at 7. The orthopedist maintained his opinion that Petitioner suffered from frozen shoulder, specifically right shoulder pain that "started after flu shot injection[.]" *Id.*

Petitioner returned to her pain management specialist on August 3, 2022, to follow up regarding her low back pain. Ex. 5 at 22. Also during this visit, she reported that she "also has suspected SIRVA from the flu vaccine given by PCP." *Id.* at 24. This treater referred Petitioner for an MRI of her right shoulder on several occasions. *See,* e.g., *id.* at 12, 16, 20.

Thereafter, Petitioner sought a second opinion with another orthopedist on November 21, 2022, for her right shoulder pain. Ex. 10 at 6. She explained that she "had a flu shot in January 2022 and started having pain in the right shoulder following the shot."

---

8, 2022,) but also cancelled this visit due to illness. *Id.* at 3. The PT referral was cancelled on June 21, 2022. *Id.* at 7. This fact underscores that Petitioner was able to live with her symptoms without seeking this type of treatment and thus will be relevant to a determination of damages, if ultimately appropriate.

[7] Petitioner subsequently went to the ER for nausea and vomiting thought to be at least "partially induced" by her receipt of this steroid injection. Ex. 14 at 16, 77.

*Id.* Petitioner told this orthopedist that she had "been diagnosed with SIRVA as a result of her flu shot." *Id.* Following an examination of the right shoulder (showing limited ROM and pain), the orthopedist assessed Petitioner with right shoulder pain and adhesive capsulitis of the right shoulder. *Id.* at 8. The treater referred Petitioner to PT and advised her to continue treatment with her pain management specialist. *Id.*

Additionally, Petitioner's son submitted a declaration on Petitioner's behalf (authored in May 2023). Ex. 11. He attests that "[a]s soon as [Petitioner] got her flu shot, she was crying a lot because it hurt her a lot." *Id.* ¶ 4. He saw that Petitioner's arm "got really swollen and red" following her flu vaccination. *Id.* ¶¶ 4, 6. More so, Petitioner's daughter attests in her own declaration (authored in May 2023), that she brought Petitioner to receive her subject flu vaccination. Ex. 12 ¶ 4. Petitioner's daughter attests that Petitioner was "immediately hurt by the shot" and that she "immediately complained of burning and stinging the entire ride home." *Id.* Petitioner's daughter notes that Petitioner "could not lift her arm the very next morning after the shot and it became worse day by day." *Id.* ¶ 6. Finally, Petitioner's son-in-law also authored a declaration on Petitioner's behalf (authored in May 2023). Ex. 13. He generally attests that Petitioner complained to him of pain, redness, and swelling at the injection site in the right arm following her January 11, 2022 vaccination. *Id.* ¶¶ 4, 6.

No other medical records or affidavit/declaration evidence has been submitted regarding the onset of Petitioner's symptoms or vaccine situs.

## IV. Findings of Fact

### A. Site of Vaccine Administration

Despite Respondent's reasoned objections (e.g., Respondent's Report at 9-10), the record supports the conclusion that a flu vaccine was likely administered in Petitioner's right shoulder, as alleged. As the above-referenced medical entries establish, when seeking medical treatment on essentially every post-vaccination occasion, Petitioner consistently reported *right shoulder pain* (which she also mostly attributed to her vaccination),[8] and she underwent diagnostic procedures and treatment of the right

---

[8] Indeed, as I briefly noted in my Order to Show Cause (ECF No. 25), while the multiple vaccine "question" is surely a complicating factor in this case, there is ample evidence that supports the conclusion that Petitioner attributed her post-vaccination symptoms to the subject flu vaccine, only. *See,* e.g., *Zebofsky v. Sec'y of Health & Hum. Servs.*, No. 15-1084V, 2016 WL 8786201 (Fed. Cl. Spec. Mstr. Dec. 15, 2016) (finding that the petitioner could establish that the covered flu vaccine caused the alleged injury versus the non-covered pneumococcal vaccine because the medical records consistently reflected that the petitioner reported pain following the covered flu vaccine and were silent as to the non-covered vaccination). For instance, on May 5, 2022, Petitioner declined a steroid injection for low back pain "due to complication from flu vaccine." Ex. 5 at 29-30. Then, on May 10, 2022, Petitioner told ER staff that she "had a flu shot prior to

shoulder, specifically. *See,* e.g., Ex. 2 at 31-32 (an x-ray of the right shoulder); *id.* at 17-19 (complaints and an examination specific to the right shoulder); Ex. 3 at 19 (orthopedic treatment of the right shoulder). Thus, there is at least no reasonable dispute that Petitioner's complaints referenced her right arm – not the left.

The record from Petitioner's April 25, 2022 PCP visit, noting "ongoing right arm pain since last office visit" (the visit during which she received the subject flu vaccination) and that she "th[ought] it was from a vaccine injection" (Ex. 2 at 55), is particularly persuasive. While this record is from more than three months post-vaccination, it is the most contemporaneous record mentioning shoulder symptoms other than the vaccine administration record itself. And it is consistent with all of Petitioner's other reports to treaters thereafter concerning right shoulder/upper extremity pain following a flu shot. *See,* e.g., Ex. 4 at 2, 20 (ER notes from May 10, 2022 showing a report of "right upper arm" pain following a flu shot); Ex. 2 at 17, 19 (May 25, 2022 PCP complaints of "significant right upper extremity pain" and she underwent an examination of the right shoulder); Ex. 5 at 26-27 (June 6, 2022 reports of "right upper extremity pain since getting a flu vaccine by PCP"). Thus, to rule otherwise, there would need to be instances of conflicting reports as to vaccine situs; such circumstances are not present here.

I acknowledge that the vaccine administration record *itself* memorializes a different site of the administration of Petitioner's flu vaccine – the left *thigh*. Ex. 2 at 126. But that record is an automated, computer-generated, electronic entry, and I accordingly do not give it much weight in resolving this issue. *See id.* I often note in SIRVA matters that it is not unusual for the information regarding situs of vaccination set forth in this kind of document to be incorrect.[9] In many instances, the information regarding situs is recorded prior to vaccination and is not subsequently corrected, even if the vaccine is then actually

---

the onset of the symptoms" in her right arm. Ex. 4 at 2, 20. Also, during Petitioner's June 6, 2022 follow-up with her pain specialist, she reported a history of right upper extremity pain since getting a flu vaccine. Ex. 5 at 26-27. She also related her pain to her flu shot during her orthopedic visit on June 23, 2022. *See* Ex. 3 at 19, 21; *see also id.* at 7; Ex. 10 at 6. Comparatively, there is lesser evidence that Petitioner could not distinguish her pain as being related to the covered flu shot or the non-covered pneumonia shot. *See,* e.g., Ex. 2 at 54 (an April 25, 2022 report of right shoulder pain after getting pneumonia and flu vaccinations); *id.* at 17 (a May 25, 2022 report complaining of "significant right upper extremity pain . . . after getting pneumonia and flu vaccine"). Accordingly, it appears likely Petitioner can prevail on this issue if it continues to be contested.

[9] *See,* e.g., *Arnold v. Sec'y of Health & Hum. Servs.,* No. 20-1038V 2021 WL 2908519, at *4 (Fed. CL. Spec. Mstr. June 9, 2021); *Syed v. Sec'y of Health & Hum. Servs.,* No. 19-1364V, 2021 WL 2229829, at *4-5 (Fed. Cl. Spec. Mstr. Apr. 28, 2021); *Ruddy v. Sec'y of Health & Hum. Servs.,* No 19-1998V, 2021 WL 1291777, at *5 (Fed. Cl. Spec. Mstr. Mar. 5, 2021); *Desai v. Sec'y of Health & Hum. Servs.,* No 14-0811V, 2020 WL 4919777, at *14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Rodgers v. Sec'y of Health & Hum. Servs.,* No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Stoliker v. Sec'y of Health & Hum. Servs.,* No. 17-0990V, 2018 WL 6718629, at *4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018).

administered in the opposing arm.[10] Thus, although such records are unquestionably the first-generated documents bearing on the issue of site, they are not *per se* reliable simply because they come first. In fact, I have previously determined that the very nature of vaccination record creation provides some basis for not accepting them at face value. *See,* e.g., *Rizvi v. Sec'y of Health & Hum. Servs.*, No. 21-881V, 2022 WL 2284311, at *4 (Fed. Cl. Spec. Mstr. May 13, 2022). More so, I routinely give greater weight to vaccination records that are handwritten – meaning those that require specific action on the part of the vaccine administrator, as opposed to those that are automatically generated by a computerized system. *See,* e.g., *Rizvi,* 2022 WL 2284311, at *5; *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020).

In this case, the only evidence that contradicts a right arm situs is this computerized entry. When weighed against Petitioner's clear, consistent, and fairly close-in-time reports of right shoulder pain following her receipt of a flu vaccine in that arm, this vaccine administration record entry on its own is not enough to outweigh the bulk of the evidence that favors Petitioner on this issue. I thus find by a preponderance of the evidence that Petitioner received her January 11, 2022 flu vaccine in her right arm, as alleged.

### B. Onset

A petitioner alleging a SIRVA claim must show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. §§ 100.3(a)(XIV)(B)) & (c)(10)(ii) (QAI criteria)).

As stated above, Respondent contends that Petitioner's medical records do not support that the onset of her pain occurred within 48 hours of vaccination. *See,* e.g., Respondent's Report at 10-11. But the totality of the evidence supports a favorable onset finding. Thus, the aforementioned medical records, coupled with Petitioner's (and her family members') signed declarations, establish that Petitioner consistently reported to treaters an onset close-in-time to vaccination, and that she was experiencing symptoms in the relevant timeframe.

The fact that Petitioner delayed treatment a bit (until three-and-a-half months post vaccination – on April 25, 2022) does not preclude a favorable onset finding. In other cases, *significantly greater* delays have not undermined an otherwise-preponderantly-

---

[10] In a recent Ruling by another special master, the pharmacist who had administered the relevant vaccination actually testified that she inputs "left deltoid" into the computer system as a matter of course, without confirming the actual site of vaccination, based upon the assumption that most vaccinees are right-handed. *Mezzacapo v. Sec'y of Health & Hum. Servs.*, No. 18-1977V, 2021 WL 1940435, at *4 (Fed. Cl. Spec. Mstr. Apr. 19, 2021).

established onset showing consistent with the Table. *See,* e.g., *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. denied,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because a petitioner underestimated the severity of her shoulder injury). The delay here is not nearly so long.

Likewise, the fact that Petitioner sought care on several occasions between the date of her vaccination and the April 25, 2022 visit – but without mentioning right shoulder complaints – does defeat a Table onset finding in Petitioner's favor. Notably, at least one of these visits (on March 10th) was a follow-up visit with her neurologist for pre-existing and unrelated issues pertaining to her seizures. Ex. 5 at 90. While it is somewhat problematic that Petitioner complained of "generalized body pain" and back pain to this provider (but without including right shoulder complaints specifically), I do not consider this omission to be wholly detrimental to Petitioner's onset contentions, as this visit was with a specialist for specific seizure-related issues.

The same can be said regarding Petitioner's denial of shoulder pain to her pain management specialist on March 21, 2022. Ex. 5 at 36. Although it would have been appropriate to mention other musculoskeletal complaints of pain to this type of treater, Petitioner's failure to do so is (at least partially) explained by the fact that this visit was for pre-existing back pain. And it is reasonable that Petitioner would not have brought up new shoulder pain at this point, especially if she thought her pain would "eventually go away" with home remedies as she contends in her declaration. Ex. 1 ¶¶ 4-5, 7. Thus, I do not find that the absence of shoulder references in these records of intervening visits to prevent a showing of Table-consistent onset. (I will note, however, Petitioner's ability to seek care for other, non-shoulder related issues during this time is further supportive of the conclusion that Petitioner's SIRVA was mild overall).

In addition, and most importantly, the filed medical records establish that once she sought care for shoulder-related complaints, Petitioner consistently and repeatedly dated her shoulder pain as occurring close-in-time to the January 11, 2022 vaccination – beginning with the April 25th encounter. Indeed, during that visit, she reported right shoulder pain "[s]ince 01/2022 . . . after getting [] flu vaccine [sic]." Ex. 2 at 54. Other subsequent medical records describe onset consistently as beginning in January 2022 following her receipt of the subject vaccination. *See,* e.g., Ex. 2 at 17 (a May 25, 2022 note stating "significant right upper extremity pain since 01/2020 to [sic] after getting pneumonia and flu vaccine"); Ex. 10 at 6 (a November 21, 2022 orthopedic history of right

shoulder pain after she had "a flu shot in January 2022"). More so, such entries corroborate the consistent contentions made in Petitioner's (and her family's) declarations that her pain began within 48 hours of vaccination. *See* Exs. 1, 11-13.

Some of Petitioner's records suggest an onset beginning at some unspecified time after vaccination (or assessments of pain generally after the flu vaccination). But I do not find this evidence tips against a favorable onset determination. *See,* e.g., Ex. 5 at 29-30 (a May 5, 2022 note declining a steroid injection "due to complication from flu vaccine."); *id.* at 27 (a June 6, 2022 note stating "h/o right upper extremity pain since getting a flu vaccine"); Ex. 3 at 19 (a June 23, 2022 orthopedic assessment of right shoulder pain "relate[d] to after getting a flu shot."); *id.* at 5-7 (a July 28, 2022 orthopedic assessment of right shoulder pain that "started after flu shot injection[.]"). In fact, Petitioner and her treaters still deemed her pain to have begun after her receipt of the vaccine in question. These records are thus fairly consistent with her other specific reports of pain beginning after her subject vaccination discussed above and provide further support for 48-hour onset.

Finally, Petitioner's reporting during her May 10, 2022 ER visit does not negate a favorable onset showing. While she reported both a "6 week[]" history of right upper arm pain, as well as "2 to 3 weeks [sic] worth of right shoulder/arm pain" prior to this visit – thus placing onset well outside the Table's 48-hour window – she nonetheless related the onset of her pain to the subject vaccination. *See* Ex. 4 at 2, 20. Petitioner's reports on this occasion on their own thus cannot overcome the weight of the evidence that otherwise favors her on this issue.

### Conclusion

Petitioner has established that she received the subject flu vaccination in her right shoulder, as alleged. Additionally, Petitioner has provided preponderant evidence that the onset of her shoulder pain occurred within 48 hours of vaccination.

I thus *strongly* encourage the parties to promptly attempt an informal resolution of this claim before expending any further litigative resources on the case. If at any time informal resolution (or either settlement or proffer) appears unlikely, given that the claim has been pending in SPU for well over one year (having been assigned in October 2023), the parties should propose a method for moving forward, i.e., with a proposed briefing schedule regarding the remaining disputed issues or otherwise stating how they wish to proceed – including requesting transfer out of SPU, if necessary.

12

**Accordingly, by no later than <u>Wednesday, February 11, 2026</u>**, the parties shall file a joint status report concerning the status of Petitioner's damages demand and, if appropriate, stating whether and when Respondent would like to file an amended Rule 4(c) Report or otherwise stating how he wishes to proceed – including whether he is open to informal discussions.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master